UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAYMOND ELLIOTT and JOHN HARTIN on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| JPMORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN SECURITIES INC., J.P. MORGAN FUTURES INC., HSBC HOLDINGS PLC, HSBC SECURITIES (USA) INC., and HSBC BANK USA, NATIONAL ASSOCIATION, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 10 CIV 8461

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
NOV 08 2010
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs Raymond Elliott and John Hartin bring this action against JPMorgan Chase &

Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc., J.P. Morgan Futures Inc.

(collectively, "JPMorgan"); and HSBC Holdings PLC, HSBC Securities (USA) Inc., and HSBC

Bank USA, National Association (collectively, "HSBC") (together with JPMorgan,

"Defendants") based upon information and belief as to all allegations except the allegations of

Plaintiffs' own conduct, which is based upon knowledge, as follows:

## SUMMARY OF ALLEGATIONS

1. **Unlawful conduct.**

(a)     From June 2008 and continuing through the present (the "Class Period"),

Defendants have intentionally acted to manipulate prices of silver futures and options contracts

traded on the Commodity Exchange Inc. ("COMEX") division of the New York Mercantile

Exchange ('NYMEX').  Such conduct violates Section 9(a) of the Commodity Exchange Act

("CEA"), 7 U.S.C. § 13b.

(b)      Also during the Class Period, Defendants have intentionally and unlawfully violated the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(c).

2.      **Purpose and Objective.**  Defendants' collusive and individual unlawful behavior has primarily been intended to manipulate  prices of COMEX silver futures and to influence COMEX options accordingly: call options would generally decline and put options would generally increase in price.  But such behavior also has been intended, at times, to maintain prices.  This includes maintaining prices at levels at which options, including call options on silver futures contracts traded on the COMEX, would expire worthless ("options pinning").

3.      **Means**.  (a) Defendants have effected their foregoing manipulation through diverse means.  These means themselves include lawful and unlawful acts.

(b)      Defendants have held large positions in silver futures and silver options.

(c)      Defendants have held a concentrated and substantial amount of the open interest in silver futures contracts.

(d)      Defendants have made large trades at key times.

(e)      Defendants or others have made large "spoof" orders which appeared on the trading screens; "spoofing" is the submission of a large order which is not executed but influences prices and is then withdrawn before it reasonably can be executed.

(f)      Defendants have communicated with and/or signaled one another their trades.

4.      As a direct result of Defendants' unlawful conduct alleged herein, Plaintiffs and members of the Class have been injured in their property and damaged by transacting in the artificial market that has existed for COMEX silver futures and options contracts.

5.      For example, in February 2010 a manipulated "crash" occurred as predicted and described by an independent metals trader in London named Andrew McGuire, who had contacted the Commodity Futures Trading Commission ("CFTC") with detailed allegations of the mechanics of Defendants' illegal conspiracy to manipulate the prices of COMEX silver futures and options contracts.  In his communications with the CFTC, Maguire described how JPMorgan silver traders signaled market participants, including HSBC, in advance of their manipulation, so that they, along with other traders, could reap enormous profits by artificially and unlawfully manipulating the price of COMEX silver futures and options contracts.

6.      Maguire advised the CFTC on February 3, 2010, by email that he had received a "signal" from Defendants indicating their intent to depress the prices of COMEX silver futures and options contracts two days later, at or around the time of the announcement of the Non-Farm Payroll Report.[1]  Maguire explained how the manipulation would unfold based on whether the jobs report would be positive or negative.  Either way, Maguire advised that Defendants would manipulate their short positions in such a manner to drive the price of silver sharply downward.  The scheme played out exactly as predicted, with the price of silver dropping dramatically between February 3 and February 5, 2010.

7.      In March 2010, Maguire disclosed his cooperation with the CFTC and released his emails to the CFTC which predicted the market suppression of COMEX silver futures and options contracts.

8.      Since that time, Defendants have stopped adding to their short positions in COMEX silver futures contracts.  As a result, the price of silver has increased approximately

[1] The Non-Farm Payroll Report is an influential statistic and economic indicator released monthly by the United States Department of Labor as part of a comprehensive report on the state of the labor market.

3

$7.00 since the end of July. In other words, by not substantially increasing their already substantial short positions, Defendants have taken their foot off the neck of the market, and the market has responded accordingly.

## JURISDICTION AND VENUE

9.      Silver is a "commodity" and is the "commodity underlying" silver futures and options contracts traded on the COMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

10.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25, and the Racketeering Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(c).

11.     This Court has jurisdiction under Section 22 of the CEA, 7 U.S.C. §25, and 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this District pursuant to Section 22 of the CEA, 7 U.S.C. § 25, and 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b)(c) and (d). The Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York. Defendants' unlawful acts manipulated the prices of COMEX silver ("silver") contracts which were traded in this district in which COMEX is located, at One North End Avenue, New York, New York. As used herein, COMEX silver contracts means COMEX silver futures contracts, and COMEX options on such contracts.

13.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

14.     Plaintiff Raymond Elliott is a resident of South Dakota.  During the Class Period, Plaintiff Elliott transacted in COMEX silver options and was injured in his property as a result of Defendants' unlawful conduct.

15.     Plaintiff John Hartin is a resident of Texas.  During the Class Period, Plaintiff Hartin transacted in COMEX silver futures and was injured in his property as a result of Defendants' unlawful conduct.

16.     Defendant JPMorgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York, New York.  JPMorgan Chase & Co. is a leading global financial services firm and one of the largest banking institutions in the United States with $2.1 trillion in assets, $164.7 billion in stockholders' equity, and operations in more than 60 countries.

17.     Defendant J.P. Morgan Clearing Corp. ("JPMC"), formerly known as Bear, Stearns Securities Corp., is a Delaware corporation with its corporate offices in Brooklyn, New York.  JPMC is a subsidiary of J.P. Morgan Securities Inc., which is a wholly owned subsidiary of JPMorgan Chase & Co.  JPMC is a registered Futures Commission Merchant with the CFTC.

18.     Defendant J.P. Morgan Securities Inc. ("JPMS") is a Delaware corporation with its principal place of business in New York, New York.  JPMS is a wholly owned subsidiary of JPMorgan Chase & Co.  JPMS, through JPMC, provides securities and futures clearing, customer financing, securities lending and related services.

19.     Defendant J.P. Morgan Futures Inc. ("JPMFI") is a Delaware corporation with its principal place of business in New York, New York.  JPMFI is a U.S. futures commission merchant and wholly owned subsidiary of JPMorgan Chase & Co.  JPMFI provides research, sales, execution and clearing services in futures and options across fixed income, equity, foreign

exchange and commodity asset classes.  JPMFI holds the U.S. accounts of JPMorgan Chase's global futures and options business customers.

20.      Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England.  As of 2009, HSBC Holdings was the world's largest banking group and the world's sixth largest company according to Forbes Magazine.

21.      Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation with a corporate office located in New York, New York.  HSBC USA is a wholly owned subsidiary of HSBC Markets (USA) Inc. whose ultimate parent is HSBC Holdings. HSBC USA is a registered broker-dealer of securities under the Securities Exchange Act of 1934 and is a registered Futures Commission Merchant with the CFTC.

22.      Defendant HSBC Bank USA, National Association ("HSBC NA") is a Texas company with an office in Wilmington, Delaware.

23.      As used herein, Defendants refers to J.P. Morgan Group Defendants and the HSBC Group Defendants.

(a)      As used herein, JPMorgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc. and J.P. Morgan Futures Inc. are sometimes referred to as "the JP Morgan Group Defendants" or "JPMorgan".

(b)      As used herein, HSBC Holdings plc, HSBC Securities (USA) Inc., and HSBC Bank USA, National Association are referred to as the HSBC Group Defendants.

## FACTUAL ALLEGATIONS

### I.    BACKGROUND

24.    Unlike the securities markets, in the commodity futures market (a) more than 99% of the contracts do not result in delivery and may remain open for multi-month periods with no delivery of the commodity, and (b) at any given time, one-half of the participants in the futures market are "short" and one-half of the participants are the buyers of a contract or "long".

### A.    Overview of COMEX Silver Futures and Options Contracts

25.    Silver futures contracts and silver options contracts are traded on COMEX.

26.    COMEX, a division of the New York Mercantile Exchange ("NYMEX"), has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  COMEX submits to the CFTC various rules and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in various precious metals futures and options contracts, including futures and options contracts for silver.  COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts.

27.    COMEX provides standardized silver futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 60 sequential months into the future depending upon the month in which the contract was executed.  A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future.  The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

28.    Trades of silver futures contracts on the COMEX have two "sides."  The "long" side represents the buyer of a contract who is obligated to pay for the silver and take delivery.

The "short" side represents the seller of a contract who is obligated to receive payment for the silver and make delivery. If a market participant holds its position to the end of the settlement period for a silver futures contract, the market participant is obligated to "go to delivery." That is to say, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical silver. Longs must take delivery and shorts must make delivery of 5,000 troy ounces per contract over the course of the contract month. The price for the silver that goes to delivery is the "settlement price" of the COMEX silver futures contract.

29.    Only a small percentage of all futures contracts traded each year on COMEX and other exchanges result in actual delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a silver futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of silver by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

**B.    Short Option Positions**

30.    There are a number of ways to "go short," i.e., bet that the price of silver will decrease. As discussed above, one can sell a futures contract, which confers upon the seller an obligation to deliver silver at a pre-specified date in the future at a pre-specified price. Alternatively, one can sell call options, which confers upon the buyer of the call option the right, but not the obligation, to purchase silver from the seller at a pre-specified "strike price" at some date in the future (i.e., expiry). At expiry, if the price of silver exceeds the strike price, the buyer will exercise the option, which means the seller will pay the difference between the prevailing

price and the strike price.  Conversely, if the price of silver falls short of the strike price, the option expires "out of the money."

31.     In the cases above (or any other method in which an entity creates a short position), the entity that is short benefits as prices fall.  In the case of selling a futures contract, the seller at time of contract expiration simply offsets his position by purchasing a futures contract and pockets the difference in prices.  In the case of a call option, the seller benefits if the prevailing price is below the strike price because it collects the option premium and pays nothing to the purchaser.

32.     Upon information and belief, during the Class Period, Defendants had net short positions in silver options contracts, including but not limited to, the sale of call options.

**C.     Physical and Futures Prices for the Underlying Physical Commodity are Directly Related to One Another**

33.     The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date.  Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are in fact, correlated.  For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month.  The rise in the future price for next month delivery will cause a reaction today among producers and consumers of the commodity.

34.     For the producers of the commodity, the increase in the price of that commodity for delivery next month makes it more profitable to shift sales from the current month to the next month.  Conversely, for buyers of physical silver, the increase in price for delivery next month creates an incentive for them to purchase today rather than waiting until next month when the price increase is expected.  Thus, the increase today in futures price (for delivery next month) has

9

caused producers to decrease the available supply of the commodity and prompted buyers of physical silver to increase their demand. The decrease in supply coupled with the increase in demand, causes today's spot prices for the commodity to increase. The same causal economic story (albeit in reverse) prevails if futures prices decline.

35.     Therefore, changes in futures prices for delivery months into the future have tangible effects on physical spot prices today. Put statistically, futures prices and physical spot prices are linked and correlated.

## II.     THROUGH THEIR CONCENTRATED SHORT POSITIONS, DEFENDANTS HAD THE POWER TO AND DID SUPPRESS COMEX SILVER FUTURES AND OPTION CONTRACT PRICES

### A.     The COMEX Silver Futures and Options Contracts Market is Susceptible to Collusion

36.     The silver futures market is a thin market. The number of futures contracts traded in the silver market is small, i.e., thin, in comparison to markets involving other commodities. For instance, in August 2008, there were only 129,240 open interest silver futures contracts, i.e., silver futures contracts that had not yet settled, as opposed to 1.25 million open interest NYMEX Light Sweet Crude Oil futures contracts and 408,430 open interest COMEX gold futures contracts during the same period.

37.     The relatively sparse number of silver futures contracts regularly traded on COMEX enabled large banks, such as Defendants, to manipulate the price of silver futures contracts during the Class Period by flooding the market with a disproportionate number of contracts.

38.     In addition, the market for COMEX silver futures and options contracts is highly concentrated with only a handful of very large banks controlling a dominant number of futures and options contracts.

39.     In August 2008, subsequent to JPMorgan's acquisition of Bear Stearns, Defendants JPMorgan and HSBC controlled over 85% of the commercial net short position in COMEX silver futures contracts and 25% of all open interest short positions.

40.     In the first quarter 2009, HSBC NA held 40% of all precious metals derivatives (excluding gold) held by commercial banks.

41.     As of the first quarter 2009, Defendants owned more than 96 percent of all precious metal derivatives held by U.S. banks (excluding gold) with a combined notional value of $7.9 billion.[2]

42.     Prices in the silver futures and options market respond much more to large orders, large trades, and large positions than do prices in other commodity markets.

**B.      Substantive Allegations**

43.     A review of the Office of Comptroller of the Currency's Quarterly Report on Bank Derivatives Activities for the first quarter of 2009, which provides information on the value of derivative contracts for the top five commercial banks and trust companies, indicates that, together, JPMorgan and HSBC controlled 96% of all precious metals derivative contracts besides gold (which include silver).

44.     In March 2008, JPMorgan purchased Bear Stearns.  Bear Stearns had amassed a significant short position in silver contracts.

45.     By August 5, 2008, Defendants were short a massive 33,805 contracts, or more than 169 million troy ounces of silver.  This short position was equal to an approximately 25% of annual world mine production of silver.

---

[2] The "notional value" is the value of a derivative's underlying asset as determined by the asset's spot price. In the case of an options or futures contract, the notional value is the number of units of the asset underlying the contract multiplied by the spot price of the asset.

46.    Defendants consistently maintained their massive short positions until March 2010, at or about the time when Andrew McGuire's complaints to the CFTC about manipulation began.

47.    During the Class Period, the trading of silver futures and options indicates that large "spoofing" orders were entered and that options pinning occurred.

48.    According to publicly available information, JPMorgan Group Defendants sent "signals" to HSBC Group Defendants coordinating Defendants' collusive restraint of trade, fixing, and manipulation of the prices of COMEX silver futures and options contracts.

49.    According to publicly available information, such "signals" were sent, among other times, on a monthly basis on or around the dates of certain key events, including: (a) following the United States Department of Labor's issuance of Non-Farm Payroll Reports, which are released during the first week of each month; (b) at the time of Options Expiry[3] on the last four business days of each month; and (c) during COMEX silver futures contract roll-over.[4]

50.    Further according to publicly available information, manipulative trades and orders have repeatedly been entered prior to the opening of trading COMEX silver futures.

51.    According to publicly available information, the JP Morgan Group Defendants and the HSBC Group Defendants were among the Defendants who engaged in the forgoing manipulative practices.

---

[3] The expiration date of an options contract, a.k.a., Options Expiry, is the day on which an options contract is no longer valid and, therefore, ceases to exist. Because Defendants held net short positions in silver options contracts, Defendants profited by driving down the price of COMEX silver futures contracts. Indeed, by depressing the price of COMEX silver futures contracts, Defendants assured themselves that the long options contracts opposite their positions would expire out of the money. Since the options expired worthless, traders who owned the positions opposite to Defendants did not exercise their options and Defendants reaped a profit.

[4] Contract rollover occurs each month when a futures contract holder exchanges (rolls over) an expiring contract position for a contract position which expires at a later date.

52.     According to an October 27, 2010 article published in the *Wall Street Journal*, The CFTC's enforcement staff has circulated a packet of information to CFTC lawyers and commissioners, outlining some of its findings in the silver probe.

53.     According to the same article, CFTC lawyers have interviewed employees of JPMorgan in its metals-trading business as well as industry traders, commodity executives, experts and employees of other metals-trading firms.

## III.    OTHER FACTORS INDICATING A MANIPULATION

### A.    Standardized Product with High Degree of Interchangeability

54.     When products offered are viewed as interchangeable by market participants, it is easier to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices.  This makes it easier to form and sustain an unlawful anticompetitive agreement or conspiracy.

55.     Here, COMEX silver futures and options contracts are interchangeable.  Indeed, the COMEX specifies the terms of each contract, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

### B.    Defendants Had the Opportunity to Conspire Through Their Participation in Trade Associations

56.     Participation in trade associations can foster and facilitate an unlawful anticompetitive conspiracy.  Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided many opportunities to conspire and share confidential information and trading strategy.

57.     For example, Defendants are members of the Futures Industry Association ("FIA"), the Futures and Options Association ("FOA") and the London Bullion Market Association ("LBMA").

58.     HSBC USA and JPMFI are regular members of the FIA, a United States-based industry advocacy and education organization whose regular members are all futures commission merchants.  In addition, the FIA's board of directors includes the managing director and global co-head of JPFMI's futures and options and OTC clearing, and Robert T. Cox, the managing director and head of futures of HSBC USA.  Richard Berliand, the chairman of JP Morgan Futures and Options and head of JP Morgan-Bear Stearns' prime brokerage business, serves as a special advisor to the board.  As part of FIA, Defendants participate in the annual Futures & Options Expo, the FIA/OIC Investor Education Day, the International Derivatives Expo, and other events and meetings.

59.     HSBC Bank PLC and JPMS are members of the FOA, an industry association for firms and institutions carrying on business in futures, options and other derivatives or which use such products in their business.  FOA's principal role is to represent the interests of its members in the public and regulatory domain and deliver a wide range of support services to the membership.  Defendants participate in annual events and conferences such as International Derivatives Week.  In addition, Richard Berliand of JPMFI serves as a special advisor to FOA's Board.

60.     Both JP Morgan Chase and HSBC NA are also members of the LBMA, the London-based trade association that represents the wholesale gold and silver bullion market in London.

C.    **Absent an Unlawful Conspiracy to Suppress and Manipulate the Price of COMEX Silver Futures and Options Contracts, Defendants' Actions Were Contrary to Their Economic Self-Interest**

61.    Each of the Defendants would have been more likely to have taken or maintained their enormous short positions if it knew beforehand and was confident that the other Defendant would support it and take similar short positions in the market for COMEX silver futures and options contracts.

D.    **The CFTC Investigation**

62.    In September 2008, the CFTC commenced an investigation into manipulation in the silver market.

63.    In September 2009, CFTC Commissioner Bart Chilton announced that the investigation was continuing, which, up to that time, had consumed 2,318 staff hours, 32 individual interviews, a review of about 40,000 documents and an analytical review by an outside expert.

64.    The CFTC's enforcement staff circulated a packet of information to the staff and commissioners outlining some of its findings, according to an October 27, 2010 *Wall Street Journal* article.

65.    The same article also reported that CFTC staff has interviewed employees of JPMorgan in its metals-trading business as well as industry traders, commodity executives, experts and employees of other metals-trading firms.

66.    The article cited a CFTC weekly report for October 19, 2010, wherein it showed that less than four market players held 24.3% of all net bearish bets in the silver market.  Relying on silver traders and a person close to the investigation, the article confirms that JPMorgan and HSBC are among those market participants.

67.     On October 26, 2010, CFTC Commissioner Bart Chilton announced that there have been "violations of the Commodity Exchange Act in the silver market." Specifically, Commissioner Chilton concluded "there have been fraudulent efforts to persuade and deviously control" prices in the silver market, which "should be prosecuted." Commissioner Chilton indicated that the CFTC investigation was continuing and added that he was "hopeful that the agency will speak publicly about the investigation in the very near future."

## FRAUDULENT CONCEALMENT

68.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self concealing. Defendants, inter alia, conspired and engaged in secret and surreptitious activities in order to manipulate and make artificial prices for COMEX silver futures and options contracts.

69.     Defendants fraudulently concealed their participation in their conspiracy to manipulate and make artificial the market for COMEX silver futures and options contracts by, among other things, engaging in secret "signals" or communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy is inherently self-concealing, Plaintiffs and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

70.     None of the facts or information available to Plaintiffs and members of the Class prior to October 26, 2010, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.

71.     Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiffs and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about October 26, 2010.

72.     As a result, Plaintiffs and members of the Class were prevented from learning of the facts *needed* to commence suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until October 26, 2010.

73.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and others similarly situated.  The "Class" is defined as:

> All persons or entities other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators (whether or not named in this Complaint) who transacted in COMEX silver futures or options contracts between June 1, 2008 through such time as the effects of Defendants' illegal conduct ceased.

75.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of the Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believes that at least thousands of geographically dispersed Class members traded COMEX silver futures and options contracts during the Class Period.

76.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

77.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including commodity manipulation and complex class action litigation.

78.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants conspired with others to artificially depress and manipulate the price of COMEX silver futures and options contracts in violation of the CEA;

(b)     whether Defendants violated RICO;

(c)     whether Defendants' conduct had a manipulative effect on the prices of COMEX silver futures and options contracts purchased or sold by Plaintiffs and the Class during the Class Period; and

(d)     the appropriate measure of damages, under the CEA and RICO laws, sustained by Plaintiffs and other members of the Class as a result of Defendants' unlawful activities.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

80.     The Class has a high degree of cohesion. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to

maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## COUNT ONE

## VIOLATION OF COMMODITY EXCHANGE ACT, 7 U.S.C. § 1

81.    Plaintiffs incorporate by reference the preceding allegations.

82.    Plaintiffs and members of the Class sold COMEX silver futures contracts and/or purchased or sold options contracts during the Class Period at prices which were made artificial by Defendants' unlawful activities, and were injured as a result of Defendants' manipulation and suppression of the prices of those contracts.

83.    Defendants' activities constitute manipulation of the prices of COMEX silver futures and options contracts during the Class Period in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

84.    Defendants are liable to Plaintiffs and members of the Class for the damages they sustained as a result of their CEA violations.

## COUNT TWO

## AIDING AND ABETTING VIOLATIONS OF
## COMMODITY EXCHANGE ACT, 7 U.S.C.§ 25

85.    Plaintiffs incorporate by reference the preceding allegations.

86.    Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation and suppression of COMEX silver futures and options contract prices, and willfully intended to assist these manipulations to unlawfully cause the price of COMEX silver futures and options contracts to be suppressed or to otherwise reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

87.     Defendants are liable to Plaintiffs and the Class for the damages they sustained as a result of the CEA violations.

## COUNT THREE

## VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT

88.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if set forth fully herein.

89.     This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the Defendants on behalf of the Class.

90.     Plaintiffs, the members of Class, and the Defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

91.     At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants conducted the affairs of an association-in-fact enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

**The JPMorgan-HSBC Enterprise**

92.     For purposes of this claim, the RICO "enterprise" is an association-in-fact consisting of (a) JPMorgan Group Defendants and (b) HSBC Group Defendants including their directors, employees and agents.  These associations-in-fact are sometimes collectively referred to herein as the "JPMorgan - HSBC Enterprise."  The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of manipulating the COMEX silver futures market.  JPMorgan Group Defendants and HSBC Group Defendants each has a common purpose of manipulating the COMEX silver futures market in order to "crash" prices and thereby reap massive profits on unwinding short positions.

93.     The Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between JPMorgan Group Defendants and HSBC Group Defendants.  There is a common communication network by which JPMorgan Group Defendants and HSBC Group Defendants shared and continued to share information on a regular basis throughout the relevant period.  Typically, this communication occurred by use of the wires and mails in which JPMorgan Group Defendants and HSBC Group Defendants discuss and agree and signal the timing of jointly flooding the COMEX market with short positions. JPMorgan Group Defendants and HSBC Group Defendants functioned as a continuing unit for the purposes of implementing the scheme, and when issues arose during the scheme each agreed to take actions to hide the scheme and to continue its existence.

94.     At all relevant times, HSBC Group Defendants was aware of JPMorgan Group Defendants' manipulative conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  Their joint activity included the following: (a) participating in "signals," meetings and/or conversations to unlawfully discuss the price of COMEX silver futures and options contracts; (b) agreeing through these "signals," meetings or conversations to unlawfully work to crash the price of COMEX silver futures contracts, prevent such prices from increasing, or to otherwise collusively make artificial the prices of COMEX silver futures and options; (c) holding large positions in the COMEX silver futures and other silver markets; and (d) making large trades intended to manipulate the market.

95.     The impacts of the scheme are still in place, i.e., JPMorgan Group Defendants and HSBC Group Defendants still hold highly concentrated short positions, although they have stopped substantially adding to their short positions in COMEX silver futures contracts.  Bank Participation Reports reveal "Big 4" holdings of silver short positions — of which JPMorgan and

HSBC control most — as follows: February 2010, 37,398; March 2010, 30,431; July 2010, 31,431; August 2010, 26,855; October 2010, 30,442.  Defendants still have the ability to manipulate the price of silver.

96.     The foregoing evidences that JPMorgan Group Defendants and HSBC Group Defendants each was a willing participant in the Enterprise; had a common purpose and interest in the establishment and operations of the scheme; and their agreement to a structure wherein JPMorgan Group Defendants and HSBC Group Defendants agreed on how the operation of the Enterprise would be conducted.  This structure was the basis in which the Enterprise operated.

**The Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

97.     The Enterprise engaged in and affected interstate commerce because it engaged in the manipulation of silver prices on a national exchange (COMEX).

98.     During the relevant period, the Defendants' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and funds by the U.S. mails and interstate wire facilities.

99.     The nature and pervasiveness of the scheme, which was orchestrated out of the trading operations of each Defendant, necessarily required those traders to communicate directly and frequently by the U.S. mails and by interstate wire facilities.

100.     Many of the precise dates of Defendants' uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Defendants' books and records.  Indeed, an essential part of the successful operation of the scheme alleged herein depended upon secrecy.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of

mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme as follows.

101.   The Defendants' use of the U.S. mails and interstate wire facilities to perpetrate the scheme involved hundreds or thousands of communications throughout the relevant period including, *inter alia*:

(a)   Signaling via interstate wire facilities the timing that they would flood COMEX with short positions, thereby manipulating and "crashing" the price of COMEX silver futures and options contracts; and

(b)   Placing orders on COMEX via interstate wire facilities in order to carry out the scheme.

**Conduct of the RICO Enterprises' Affairs**

102.   During the relevant period, the Defendants have exerted control over the Enterprise and, in violation of Section 1962(c) of RICO, the Defendants conducted or participated in the conduct of the affairs of the Enterprise, directly or indirectly, by accumulating market power to influence the price of silver on COMEX by virtue of the concentrated positions that they had amassed and using that power to flood COMEX with short positions, thereby manipulating and "crashing" the price of COMEX silver futures and options contracts.

103.   The Enterprise had a decision-making structure which included JPMorgan and HSBC.  For example, JPMorgan would at times send a signal indicating that Defendants should flood COMEX with short positions, thereby manipulating and "crashing" the price of COMEX silver futures and options contracts.

104.   In violation of Section 1962(c) of RICO, each Defendant conducted the affairs of the Enterprise.

**The Defendants' Pattern of Racketeering Activity**

105.    Each of the Defendants conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The Defendants' pattern of racketeering likely involved hundreds if not thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the Defendants intended to defraud plaintiffs, members of the Class and other intended victims.

106.    Defendants' pattern of racketeering activity included (a) participating in "signals," meetings and/or conversations to unlawfully discuss the price of COMEX silver futures and options contracts; (b) agreeing through these "signals," meetings or conversations to unlawfully work to crash the price of COMEX silver futures contracts, prevent such prices from increasing, or to otherwise collusively make artificial the prices of COMEX silver futures and options; (c) holding large positions in the COMEX silver futures and other silver markets with no ability to actually deliver the supply; and (d) making large trades intended to manipulate the market.

107.    The Defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiffs and members of the Class.  Each separate use of the U.S. mails and/or interstate wire facilities employed by the Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class.  Each of the Defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

**Damages Caused by the Defendants' Scheme**

108.    The Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and members of the Class to be injured in their business or property.  Plaintiffs and other members of the Class who traded COMEX silver futures and options contracts during the relevant period were deprived of normal, competitive trading patterns and instead were subjected to artificially determined prices that were suppressed as a result of Defendants' unlawful conduct.

109.    Under the provisions of Section 1964(c) of RICO, the Defendants are jointly and severally liable to Plaintiffs and members of the Class for three times the damages that Plaintiffs and the Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for relief as follows:

(A)     Certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives and their counsel as Class counsel;

(B)     Determining that the unlawful conduct alleged herein is a violation of the CEA;

(C)     Awarding Plaintiffs and the Class damages as provided under the CEA, together with prejudgment interest;

(D)     Determining that the unlawful conduct alleged herein is a violation of RICO;

(E)     Awarding Plaintiffs and the Class damages, as provided under RICO jointly and severally, in an amount to be trebled in accordance with RICO;

(F)     Awarding Plaintiffs and the Class their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(G)     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

Dated: New York, New York
         November 9, 2010

MILBERG LLP

By:

Peter Safirstein
Peggy J. Wedgworth

One Pennsylvania Plaza
New York, New York 10119
Telephone:  212-594-5300
Facsimile:  212-898-1229
psafirstein@milberg.com
pwedgworth@milberg.com

Jonathan H. Waller
Haskell Slaughter Young & Rediker, LLC
1400 Park Place Tower
2001 Park Place North
Birmingham, Alabama 35203
jhw@hsy.com

Robert K. Finnell
The Finnell Law Firm
1 West Fourth Avenue, Suite 200
Rome, Georgia 30161
bob@finellfirm.com

*Attorneys for Plaintiffs*